Anthony S. JONES, Appellee,

v.

PALMER COMMUNICATIONS, INCORPORATED, Steve Oswalt and Scott Pope, Appellants,

City of Des Moines, Iowa, Robert V. Armstrong, Individually and in his Official Capacity as Chief of the Des Moines Fire Department, Defendants.

No. 88–371.

Supreme Court of Iowa.

May 17, 1989.

Rehearing Denied June 8, 1989.

Kevin M. Reynolds of Whitfield, Musgrave & Eddy, and Michael A. Giudicessi, Des Moines, for appellants.

Charles E. Gribble of Sayre & Gribble, P.C., Des Moines, for appellee.

Considered by LARSON, P.J., and CARTER, LAVORATO, SNELL, and ANDREASEN, JJ.

ANDREASEN, Justice.

Anthony S. Jones filed a lawsuit alleging libel and false light invasion of privacy stemming from a news telecast concerning his termination from employment as a Des Moines firefighter. The trial court denied a motion for summary judgment filed by the media defendants: Palmer Communications, Inc., Steve Oswalt and Scott Pope (hereinafter referred to as Palmer). We granted Palmer's application for interlocutory appeal. This appeal does not involve claims filed by Jones against the nonmedia defendants, Des Moines Fire Chief Robert V. Armstrong and the City of Des Moines.

In this appeal we have the difficult task of defining the conflicting interests between the constitutional protection afforded the free press and the protection of individuals from defamation. In reaching a decision we must reconcile the general law of defamation with the freedoms guaranteed by the first amendment of the United States Constitution and article I, section 7 of the Iowa Constitution.

## I. *Standards for Summary Judgment.*

In *Behr v. Meredith Corp.*, 414 N.W.2d 339, 341 (Iowa 1987), we articulated the well-established standards for determining whether summary judgment is appropriate in a defamation or invasion of privacy case.

Summary judgment is proper when there is no genuine issue of fact and the moving party is entitled to the judgment as a matter of law. The burden of showing the nonexistence of a material fact is upon the moving party. While an adverse party generally cannot rest upon his pleadings when the moving party has supported his motion, summary judgment is still not proper if reasonable minds could draw different inferences and conclusions from the undisputed facts. In this respect, summary judgment is functionally akin to a directed verdict; every legitimate inference that reasonably can be deduced from the evidence should be afforded the nonmoving party, and a fact question is generated if reasonable minds can differ on how the issue should be resolved.

*Behr*, 414 N.W.2d at 341; *see also* Iowa R.Civ.P. 237(c).

■ In the context of a defamation action, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Further, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. In deciding this appeal, "we must determine whether any facts have been presented over which a reasonable difference of opinion could exist that would affect the outcome of the case." *Behr*, 414 N.W.2d at 341.

■ Summary judgment is afforded a unique role in defamation cases. Judges have a responsibility to determine whether "allowing a case to go to a jury would, in the totality of the circumstances, endanger first amendment freedoms." *See Ollman v. Evans*, 750 F.2d 970, 1006 (D.C.Cir.1984) (en banc) (Bork, Wilkey, Ginsburg & MacKinnon, JJ., concurring), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

## II. *Summary of the Record.*

A summary of this record provides the following information. Jones was hired by the City of Des Moines as a fire fighter on December 17, 1984, under the provisions of a consent decree issued by the United States District Court concerning the hiring of minorities. This decree was the result of a widely-publicized, class-action lawsuit alleging that discriminatory practices had prevented qualified minority applicants from obtaining employment with the Des Moines Fire Department. Jones was dismissed on July 9, 1986, for failure to pass a written Emergency Medical Technician (EMT) examination. Jones failed the EMT test on six different occasions and had received tutoring in an effort to pass the examination. At the time of Jones' discharge, all newly-hired fire fighters in Des Moines were required to become EMT qualified.

News reporters employed by Palmer Communications, Inc., learned that a black fire fighter had been dismissed by the Des Moines Fire Department. In light of the recent federal action for discrimination, the reporters felt that Jones' dismissal was newsworthy. In researching this story, an interview was conducted with Des Moines Fire Chief Robert V. Armstrong.

During the interview, Armstrong stated that Jones had a reading problem which led to his inability to pass the EMT examination. Armstrong said that Jones was tested for reading comprehension at Drake University and was found to read at a third-grade level. Armstrong went on to say that Jones had received special tutoring at Des Moines Area Community College (DMACC) at taxpayer expense. On August 6, 1986, the news story concerning Jones' termination was broadcast at 6:00 p.m. on a local television station owned by Palmer Communications, Inc. Prior to the

broadcast, news reporter Steve Oswalt contacted Jones' lawyer, who declined to respond. The media defendants allege that Oswalt made unsuccessful attempts to contact Jones personally. Jones disputes this allegation. At this time, the record does not include a tape or transcript of the broadcast in question.

### III. *Issues.*

This appeal raises a variety of issues. We first consider four complete defenses raised by Palmer in its motion for summary judgment. Palmer raises the complete defenses of substantial truth, the protection provided to a statement of opinion, the qualified privilege of communication by a public official, and a qualified privilege of neutral reporting.

In the alternative, Palmer argues it is entitled to a summary judgment because Jones must show "actual malice" on the part of Palmer. Palmer offers four arguments to support its claim that Jones must show actual malice. Palmer asserts that Jones must show actual malice to prevail on the false light invasion of privacy claim. Palmer also argues that Jones was a public official, a public figure, and was entangled in issues of public concern.

Further, Palmer argues that Jones must demonstrate actual malice in order to receive punitive damages. In making this claim, Palmer challenges Iowa Code sections 659.2 and 659.3 as unconstitutional. Finally, Palmer contends that it is entitled to a summary judgment even if Jones must only prove negligence.

### IV. *Development of Defamation Law.*

In order to fully discuss the issues raised in this appeal, it will be necessary to review the development of defamation law. Initially, defamation law consisted primarily of a complex set of common-law rules developed by the state courts. *See* Note, *Iowa Libel Law and the First Amendment: Defamation Displaced,* 62 Iowa L.Rev. 1067, 1068 (1977). The Supreme Court viewed defamation law as entirely outside the reach of the first amendment. *See Chaplinsky v. New Hampshire,* 315

U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942) (dicta). The Supreme Court first applied the first amendment to defamation law in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

*New York Times* afforded first amendment protection to defamation concerning the official conduct of a public official. Even if the defamatory statements were false, the plaintiff was required to show that the statements were made with "actual malice," which is defined as knowledge of the falsity or reckless disregard of possible falsity. *Id.* at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. The holding of *New York Times* was limited to speech about public officials, and extended protection even to negligently false speech about public officials. This protection of negligent speech was granted because the Court feared that the common-law standard of strict liability would have a chilling effect on constitutionally valuable speech. *Id.* at 277–80, 84 S.Ct. at 723–25, 11 L.Ed.2d at 705–07. The avowed purpose of *New York Times* is to insulate from liability those who undertake to comment on the conduct of public officials in the discharge of their official duties unless actual malice is shown. *McCarney v. Des Moines Register & Tribune,* 239 N.W.2d 152, 156 (Iowa 1976).

In the wake of *New York Times,* a plurality of the Court extended actual malice protection to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 49, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296, 315 (1971) (plurality).

The *Rosenbloom* standards were rejected in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See generally Vinson v. Linn–Mar Community School Dist.,* 360 N.W.2d 108, 117 (Iowa 1984) (discussing *Gertz* ). *Gertz* allowed for some reduction of constitutional safeguards by providing for two levels of protection. Speech concerning public officials and public figures was still protected

by the actual malice requirement. For private plaintiffs, the states were free to interpret state law and apply any level of protection for the defendant below strict liability. *Gertz,* 418 U.S. at 346–47, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. *Gertz* also provided that the actual malice standard applied to any award of punitive damages in an action for defamation. *Id.* at 349–50, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. With this discussion as a background, we now consider the issues raised in this appeal.

## V. *Complete Defenses.*

### A. Substantial Truth.

■ In Iowa, we recognize substantial truth as an absolute defense in a defamation action. *See Behr,* 414 N.W.2d at 342. The libel defendant need not establish the literal truth of every detail of the broadcast so long as the "gist" or "sting" of the broadcast in question is substantially true. *Id.* The "gist" or "sting" of the broadcast is "the heart of the matter in question—the hurtfulness of the utterance." *Id.* We determine the "gist" or "sting" by "look[ing] at the highlight of the [broadcast], the pertinent angle of it, and not to the items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Id.* at 342.

■ If the underlying facts as to the gist or sting of the defamatory charge are undisputed, the court may determine substantial truth as a matter of law. *Id.* The test for summary judgment is whether the plaintiff would have been exposed to any more public disgrace had the publication been free of error. *Id.*

■ In considering the content of any television broadcast, it is important to see the actual broadcast. A written summary is insufficient to provide the full impact of the telecast. In this case, we do not have the benefit of viewing the challenged statements in the context of the broadcast. We do know, however, that the broadcast incorrectly implied that Jones' training was entirely subsidized by taxpayers and that he

read at a third-grade level when he actually read at a level comparable with the lower one-third of junior college students. We cannot say, as a matter of law, that these statements were of secondary importance to the broadcast concerning the dismissal of Jones. We are also unable to conclude that these statements did not, by themselves, cause damage to Jones' reputation. We therefore reject Palmer's defense of substantial truth.

### B. Fact/Opinion.

■ Palmer asserts that the statements of Chief Armstrong and their broadcast are protected because they reflect only the opinions of the fire chief, not facts. Because this usually difficult question involves important first amendment issues, its determination is one for the court. The court must look to the totality of the circumstances to determine whether a statement may be actionable. *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1305 n. 7 (8th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986).

■ Opinion is absolutely protected under the first amendment. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974). It is difficult to "draw a bright line between 'fact' and 'opinion.' " *Janklow,* 788 F.2d at 1302. *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), articulated several factors for determining whether a statement is fact or opinion. The Eighth Circuit adopted these factors in *Janklow v. Newsweek, Inc.,* 788 F.2d at 1302 (8th Cir.1986).

■ The first relevant factor is "the precision and specificity of the disputed statement." *Janklow,* 788 F.2d at 1302. Related to this concept is the second factor of verifiability. *Id.* These two factors recognize that if a statement is precise and easy to verify, it is likely the statement is fact.

The third factor is the "literary context" in which the disputed statement was made. Related to the literary context of the disputed statement is the "social context," which "focuses on the category of publica-

tion, its style of writing and intended audience." *Id.* at 1303. We also consider the "public context" or political arena in which the statements were made. *Id.; Ollman,* 750 F.2d at 1002–05 (Bork, Wilkey, Ginsburg, & MacKinnon, JJ., concurring). In considering these factors, the statement must be taken as part of a whole, including the tone of the broadcast and the use of cautionary language. *Janklow,* 788 F.2d at 1302.

The statements that Jones read at a third-grade level and attended training at the expense of taxpayers are precise and specific statements which would have not been difficult to verify. These two factors tend to show the statements as fact. We are, however, unable to consider the literary, social or public context in which the statements were made because the record does not contain a recording or transcript of the broadcast. In order to classify a statement as opinion, the court must be able to consider all of the factors listed in *Janklow* in the context of the entire broadcast. *Janklow,* 788 F.2d at 1302. Failing this, Palmer's motion for summary judgment based on the defense of opinion was properly denied.

### C. Privileged Communication by Public Official.

Palmer asserts that the statements by Chief Armstrong to the media were protected as a privileged communication of a public official. As such, the broadcast of the allegedly defamatory statements may also be protected by this privilege. *See Restatement (Second) of Torts* § 612 (1977).

In Iowa, there are two types of privileges concerning statements made by public officials. *See generally* Note, 62 Iowa L.Rev. at 1071–72. Within the executive branch of government, an absolute defense against liability for libel attaches to all statements made by certain officials in the context of their participation in government. *Id.* This complete defense extends only to the highest state officials and does not apply to Chief Armstrong. *Id.*

A qualified privilege may attach to certain statements made by a lower-ranking government official which are necessary to the performance of official duties. *See Brown v. First Nat'l Bank,* 193 N.W.2d 547, 552–53 (1972). This qualified privilege does not provide a complete defense, rather, the plaintiff is required to demonstrate actual malice on the part of the public official. *Vinson,* 360 N.W.2d at 116. This qualified privilege can be defeated if it is abused. Excessive publication of otherwise privileged material will act to remove the protection afforded by this privilege. *See Brown,* 193 N.W.2d at 552–53 ("The qualified privilege by its very nature does not allow widespread or unrestricted communication."); *see also Restatement (Second) of Torts* § 604 (1977).

It is for the court to decide as a matter of law whether the qualified privilege is available for a particular statement. *Brown,* 193 N.W.2d at 552. The court must consider the relation of the statements to the duties of the public official and the underlying purpose of the qualified privilege, *see Restatement (Second) of Torts* § 603 (1977). In determining whether the publication of the statement was excessive, the court must find a "valid interest on the part of the general public which necessitated or justified" the broadcast. *Brown,* 193 N.W.2d at 552. The challenged statements must be considered in the complete context of statements made by the public official. To apply this privilege to a media defendant, it will be necessary to view the challenged statements in the context of the entire broadcast.

The record in this case will not allow us to make this determination. We do not know the precise statements made by Chief Armstrong to Palmer or the context in which these statements were later broadcast. It would be speculation on our part to determine whether the broadcast centered on an important civil rights issue or the plight of an individual fire fighter. A motion for summary judgment based on this privilege was properly denied.

D. Privilege of Neutral Reporting.

Palmer asserts the news broadcast is protected by the constitutional defense of neutral reporting. If adopted, this constitutional privilege would grant the press absolute immunity from libel judgments for accurately reporting "newsworthy" statements, regardless of the press' belief about the truth of the statements. This would be an exception to the common-law rule that republication of a defamatory statement was subject to the same liability as the original statement. *See Morse v. Times-Republican Printing Co.*, 124 Iowa 707, 717–18, 100 N.W. 867, 870–71 (1904). According to Palmer, this defense protects the news media from republication of libelous material so long as that material is newsworthy.

Palmer's argument stems from *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied, sub. nom, Edwards v. New York Times*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). In *Edwards*, an Audubon Society publication, *American Birds*, charged that scientists who claimed that the pesticide DDT did not appreciably harm bird life were either "being paid to lie, or . . . parroting something [they knew] little about." *Id.* at 117. This article did not name the challenged scientists. The *New York Times* considered the Audubon Society article to be a significant development in the nationwide debate over the use of DDT. The *Times* published an article reporting the claims in *American Birds* and named the five prominent scientists which were the target of the accusations.

In dismissing a defamation action against the Audubon Society and the *New York Times*, the Second Circuit asserted that where a "responsible, prominent organization" made "serious charges against a public figure," the first amendment protected the "accurate and disinterested" reporting of those charges. *Id.* at 120. The court went on to state that "[w]hat is newsworthy about such accusations is that they were made," and that this privilege would not be defeated by deviations in the literal accuracy of the report. *Id.*

Since the inception of a constitutional defense based on neutral reporting, this defense has been the subject of considerable debate. *See generally* Note, *The Developing Privilege of Neutral Reportage*, 69 Va.L.Rev. 853 (1983). The Supreme Court has not ruled on whether this defense has a constitutional basis.

Since *Edwards*, federal courts have provided additional precision to the boundaries of this defense. First, this defense will only apply when the defamed person is a public figure or public official. *See Cianci v. New Times Publishing Co.*, 639 F.2d 54, 67 (2d Cir.1980); *Dixon v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir.1977). Further, the republication of defamatory statements must be neutral and accurate. *See Cianci*, 639 F.2d at 69–70; *Price v. Viking Press, Inc.*, 625 F.Supp. 641, 649 (D.Minn.1985). Determining whether the republication is neutral and accurate requires careful examination of the facts on a case-by-case basis. *See Price*, 625 F.Supp. at 649.

Many courts have declined to adopt the constitutional defense of neutral reporting. *See generally Barry v. Time, Inc.*, 584 F.Supp. 1110, 1122–23 & n. 15 (N.D.Cal. 1984). One rationale advanced for the rejection of this defense is that the "newsworthiness" element discussed in *Edwards* conflicts with the Supreme Court's rejection of a public interest test in *Gertz. See, e.g., Dickey v. CBS, Inc.*, 583 F.2d 1221, 1226 n. 5 (3d Cir.1978); *Newell v. Field Enter., Inc.*, 91 Ill.App.3d 735, 756–57, 47 Ill.Dec. 429, 446–47, 415 N.E.2d 434, 451–52 (1980). Another reason used to reject *Edwards* characterizes this defense as superfluous because the press is already adequately protected by the actual malice standard articulated in *New York Times. See, e.g., Postill v. Booth Newspapers, Inc.*, 118 Mich.App. 608, 622, 325 N.W.2d 511, 517–18 (1982). Other cases have criticized the legal reasoning used in *Edwards. See Dickey*, 583 F.2d at 1225; *see also Barry*, 584 F.Supp. at 1123 n. 15.

On the other hand, some courts have approved the defense of neutral reporting. *See,* Note, 69 Va.L.Rev. at 863–64. Some courts have favorably cited *Edwards* in

support of a holding based primarily on a state common-law privilege of fair report. *See, e.g., Medico v. Time, Inc.,* 643 F.2d 134, 145 (3d Cir.) (casting doubt on the continued viability of *Dickey*), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981); *McCracken v. Gainesville Tribune, Inc.,* 146 Ga.App. 274, 276, 246 S.E.2d 360, 362 (1978); *Krauss v. Champaign News Gazette, Inc.,* 59 Ill. App.3d 745, 748, 17 Ill.Dec. 78, 80, 375 N.E.2d 1362, 1364 (1978). The elements and policy considerations of the defense of neutral reporting are often very similar to the common-law privilege of fair report. Because of this close relationship, any discussion of a constitutional defense of neutral reporting should include consideration of the fair report privilege.

In Iowa, the fair report privilege protected statements of opinion on public figures or matters of public interest, so long as such opinions were not malicious and were based on truth. *See* Note, 62 Iowa L.Rev. at 1073–74. Under this privilege, it was not a defense that the allegedly defamatory statements were simply republished from another publication. *See Morse,* 124 Iowa at 716–17, 100 N.W. at 870–71 (1904).

 In this opinion, we need not reach the ultimate question of whether the defense of neutral reporting should be adopted in Iowa or whether it would apply to a person in Jones' situation. Even if Jones were a public figure, the record in this case is insufficient to support a determination of whether the broadcast was a neutral and accurate republication.

## VI. *Application of Actual Malice Standard.*

 After *New York Times,* public officials in an action for defamation must demonstrate actual malice by clear and convincing evidence. Actual malice means that the statement is made with knowledge that it is false or with reckless disregard for its truth or falsity. *See McCarney v. Des Moines Register & Tribune Co.,* 239 N.W.2d 152, 156 (Iowa 1976). "Reckless disregard" has been held to mean a "high degree of awareness of probable falsity."

*Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964).

[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). To show malice, there must be an intent to inflict harm through falsehood. Actual antagonism or contempt has been held insufficient to show malice. *McCarney,* 239 N.W.2d at 156.

### A. Actual Malice Necessary for False Light.

 Palmer argues that Jones must show actual malice to prevail on the claim of false light invasion of privacy. Palmer fails to recognize that the "false light" cases are subject to the same constitutional restraints as defamation cases. *See Berry v. National Broadcasting Co.,* 480 F.2d 428, 431 (8th Cir.1973), *cert. dismissed,* 418 U.S. 911, 94 S.Ct. 3203, 41 L.Ed.2d 1157 (1974). It is unreasonable to allow a party to evade the standards surrounding defamation law because the plaintiff has pled an alternative theory. *Id.* In an action such as this, both parties are subject to the restraints of the law of defamation, even if a "false light" action has been pled.

### B. Public Official.

 Palmer asserts that as a fireman, Jones was a public official, therefore, he must demonstrate actual malice on the part of Palmer. Determining whether a plaintiff is a public official is a matter of federal constitutional law; state law standards are not determinative. *Rosenblatt v. Baer,* 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597, 604–05 (1966). This question is properly one for the court, not the jury. *Id.* at 88, 86 S.Ct. at 677, 15 L.Ed.2d at 606.

*New York Times* did not establish guidelines for making the determination of who qualifies as a public official. *See New*

*York Times,* 376 U.S. at 283 n. 23, 84 S.Ct. at 727 n. 23, 11 L.Ed.2d at 708 n. 23 ("[w]e have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule"). In *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597, 605 (1966) (emphasis added), the Court provided guidance by stating:

> the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, *substantial responsibility for or control over the conduct of governmental affairs.*

In *Hutchinson v. Proxmire,* 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 2680 n. 8, 61 L.Ed. 2d 411, 421 n. 8 (1979), the Court further cautioned that the category of " 'public official' ... cannot be thought to include all public employees ..."

Some state courts have adopted an expansive view of this test. Virtually all government employees may be classified as public officials in cases where courts employ a "government affiliation" test. *See* Comment, *The Constitutional Law of Defamation: Are All Speakers Protected Equally?* 44 Ohio St.L.J. 149, 157–58 (1983).

■ We reject this expansive view of public officials as being inconsistent with the plain meaning of the standards articulated in *Rosenblatt* and *Proxmire.* It strains credibility to say that Jones, as a low-ranking fire fighter, had substantial responsibility over the conduct of governmental affairs. Our holding does not modify *McCarney v. Des Moines Register & Tribune Co.,* 239 N.W.2d 152 (Iowa 1976), where a police captain was recognized as a public official without discussion of who could be considered a public official. Jones did not have responsibility or influence comparable to that of a captain of a police force.

### C. Public Figure.

■ Palmer argues that Jones is a "public figure." As a public figure, Jones would be required to demonstrate actual malice in order to prevail in this defamation action. *See Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008, 41 L.Ed.2d at 807. As with the public official determination, this question is one of federal constitutional law. *See Bagley v. Iowa Beef Processors,* 797 F.2d 632, 643 (8th Cir.1986). State law standards are not determinative.

■ The Supreme Court has recognized certain types of public figures, including the all purpose public figure, the limited purpose public figure, and the involuntary public figure. *See Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. All purpose public figures are individuals who "achieve such pervasive fame or notoriety" or "occupy positions of such pervasive power and influence that they are deemed public figures for all purposes." *Id.* at 345, 351, 94 S.Ct. at 3009, 3013, 41 L.Ed.2d at 808, 812. Limited purpose public figures are individuals who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. Little guidance is provided in the category of involuntary public figures, and the Court has acknowledged that "instances of truly involuntary public figures must be exceedingly rare." *Id.* at 354, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.[1] Our analysis will focus on whether Jones was a limited purpose public figure.

■ Palmer offers two theories to claim that Jones was a limited purpose public figure. First, Palmer argues that Jones' seeking and accepting employment with the Des Moines Fire Department at a time the department was under a federal court order to increase the hiring of minority persons makes Jones a limited purpose public figure. We reject this argument. This record reflects that Jones sought employment to satisfy his need for work, not

---

**1.** A review of the case law concerning involuntary public figures leaves the impression that this category is not merely " 'exceedingly rare'

but extinct." *See* Note, *Defining a Public Controversy in the Constitutional Law of Defamation,* 69 Va.L.Rev. 931, 937 n. 39 (1983).

in order to influence the resolution of issues of public concern.

■ Palmer also claims that by appealing his dismissal to the Civil Service Board, Jones became a limited purpose public figure. The Supreme Court has found that initiation of litigation, by itself, does not create a limited purpose public figure. *See Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154, 163 (1976) ("resort to the judicial process ... is no more voluntary in a realistic sense than [use of the courts by a] defendant called upon to defend his interest in court."). At the time of his appeal to the Civil Service Board, Jones was not interviewed by the press and did not publicly promote his version of the dispute. Jones is not a limited purpose public figure. This holding is consistent with *Anderson v. Low Rent Housing Commission*, 304 N.W.2d 239, 246–47 (Iowa), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 621 (1981), where the plaintiff initiated numerous contacts with the press and "invited attention and influenced that controversy."

### D. Issues of Legitimate Public Concern.

Palmer urges this court to adopt a standard requiring a private-figure plaintiff to demonstrate actual malice when the plaintiff is involved in a matter of legitimate public interest. In effect, this standard would reinstate the public-interest privilege articulated in the plurality opinion of *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). *Rosenbloom* was expressly rejected as a matter of federal constitutional law in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

■ *Gertz*, by itself, does not prevent this court from establishing the *Rosenbloom* standard. *Gertz* allows the states to depart from actual malice standards in defamation actions by private plaintiffs against media defendants. The states are permitted to adopt for themselves any standard of liability, "so long as they do not impose liability without fault." *Id.* at 347, 94 S.Ct. at 3010, 41 L.Ed.2d at 809. In the wake of *Gertz*, a vast majority of states

have adopted a negligence standard when a private plaintiff brings an action for defamation against a media defendant. *See* Contemporary Studies Project, *Standards Governing the News: Their Use, Their Characters, and Their Legal Implications*, 72 Iowa L.Rev. 637, 667 n. 258 (1987); Annotation, *State Constitutional Protection of Allegedly Defamatory Statements Regarding Private Individual*, 33 A.L.R. 4th 212 (1984).

Palmer offers three reasons as support for its argument that we should adopt the *Rosenbloom* "public interest" privilege in Iowa. First, Palmer asserts that recent Supreme Court decisions have weakened the viability of *Gertz*. Second, Palmer urges this court to follow other states which have established the *Rosenbloom* standard, and third, Palmer contends that Iowa case law supports this decision.

Palmer argues that three recent Supreme Court cases act to "revive" *Rosenbloom* in the aftermath of *Gertz*. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Dunn & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Each of these cases act to define a particular area of defamation law. Their narrow holdings, viewed collectively, do not weaken the viability of *Gertz*.

Palmer urges this court to follow other state courts which have adopted the *Rosenbloom* standard in the aftermath of *Gertz*. *See, e.g., Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (3d Dist. 1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *Sisler v. Gannett Co.*, 104 N.J. 256, 516 A.2d 1083 (N.J. 1986); *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450, *cert. denied sub nom., Woestendiek v. Walker*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975), *overruled in part by Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103 (Colo.1982).

We find these cases to be unpersuasive. *Gertz* provides the state courts latitude to interpret state law. If, as a matter of state jurisprudence, the state would provide greater protection of the media, the state is permitted to adopt a standard higher than negligence.

Under *Gertz*, states are free to define the appropriate standards of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual, so long as the states do not impose liability without fault. Thus, a state may adopt a standard higher than negligence. In *Aafco* and *Walker*, the state courts of Indiana and Colorado adopted the *Rosenbloom* standard of actual malice where the subject of the publication was a matter of public interest. Both *Aafco* and *Walker* have been criticized for their failure to consider their respective state law and state constitutional protections.[2]

In *Sisler v. Gannett Co.*, 104 N.J. 256, 279, 516 A.2d 1083, 1091–93 (1986), the New Jersey Supreme Court adopted the *Rosenbloom* standard even though the New Jersey Constitution qualifies the right of free speech by expressly creating responsibility for the abuse of that guarantee. *See* New Jersey Const. art. I, ¶ 6; *see also* Iowa Const. art. I, § 7 (right to free speech includes similar qualification). This constitutional provision was not directly addressed in *Sisler*. The court found that the fair report privilege under New Jersey law provided broader protection of free speech than provided by the federal constitution.

 In Iowa, the fair report privilege was developed prior to federal involvement in defamation law. Under this privilege, a person could freely publish statements of opinion on public figures or matters of public interest, so long as such opinions were based on truth and were not malicious. When the statement concerned the character, qualifications, or conduct of a public official or candidate for public office, protection from liability extended to include false statements of fact made without express malice. *See* Note, 62 Iowa L.Rev. 1067, 1073–74 (1977). Thus, the protection provided by the doctrine of fair report is now afforded by constitutional interpretations which provide absolute protection for statements of opinion and require a showing of actual malice when the statement concerns a public official or public figure. Iowa's fair report privilege does not broaden the protection now provided to the media by the first amendment.

The effect of *Aafco*, *Sisler*, and *Walker* is to shift the primary inquiry away from whether the plaintiff is a public figure or public official. Under this line of cases, the threshold question for actual damages is whether the statements are of public interest or public concern. The United States Supreme Court has expressed grave concern about the fairness of applying a public interest/public concern test to private plaintiffs. *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808 ("private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery"). Commentators have also criticized the public interest/public concern inquiry based on the lack of guidance as to the definitions of "public concern," "public interest," or "public controversy."[3]

Contrary to *Aafco*, *Walker*, and *Sisler*, we give consideration to the plain language

---

2. *See generally* Note, *Private Lives and Public Concerns: The Decade Since Gertz v. Robert Welch, Inc.*, 51 Brooklyn L.Rev. 425, 459–60 (1985). It is uncertain whether *Aafco* has any application outside of Indiana's third appellate district. *See Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 577 n. 3, 372 N.E.2d 1211, 1218 n. 3 (2d Dist.1978). *Walker* was subsequently overruled in part by *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103 (Colo.1982).

3. *See, e.g.*, Langvardt, *Media Defendants, Public Concerns, and Public Plaintiffs: Toward Fashioning Order From Confusion in Defamation Law*, 49 U.Pitt.L.Rev. 91, 127 n. 232 (1987). The Court's previous decisions do not provide reliable guidance with regard to the now-critical public concern factor. The Court, with its references to *public controversies, public concerns,* and *public interests* has created a semantic maze that is needlessly complex and hence unworkable.

of the Iowa Constitution. Article I, section 7 of the Iowa Constitution provides:

> Every person may speak, write, and publish his sentiments on all subjects, *being responsible for the abuse of that right.* No law shall be passed to restrain or abridge the liberty of speech, or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury, and if it appears to the jury that the matter charged as libelous was true, and was published with good motives and for justifiable ends, the party shall be acquitted.

Iowa Const. art. I, § 7 (emphasis added). We recognize that this express concern for the abuse of free speech is not found in the United States Constitution.

Several other states have interpreted similar clauses in state constitutions to justify the adoption of a negligence standard for private plaintiffs in a defamation action. *See, e.g., Troman v. Wood,* 62 Ill.2d 184, 195, 340 N.E.2d 292, 297 (1975) (public interest would limit responsibility for abuse of free speech imposed by state constitution); *McCall v. Courier–Journal,* 623 S.W.2d 882, 886 (Ky.1981) (abuse clause in state constitution requires adoption of negligence standard to adequately protect private reputational interests), *cert. denied sub nom. Courier–Journal v. McCall,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); *Martin v. Griffin Television, Inc.,* 549 P.2d 85, 92 (Okla.1976) ("Expressly in its Constitution, Oklahoma has weighed the right [of free speech] with the responsibility for an abuse of that right. That same responsibility is not expressly found in the federal constitution.") We agree with this line of cases and will not ignore the express concern for injury to reputation found in the Iowa Constitution.

■ To summarize, we decline to adopt the *Rosenbloom* public interest/public concern standard as an appropriate method of determining whether a plaintiff, in seeking actual damages, must demonstrate actual malice on the part of the defendant. We reject the argument that Iowa's fair report privilege requires the adoption of the *Rosenbloom* standard. Further, we believe that injection of the public interest/public concern test into this particular question would create more questions than it resolves.

## VII. *Negligence Standard.*

■ Even though we adopt a negligence standard, we are aware of the special protection traditionally provided to the media. We respect the essential role that the media plays in preserving our democratic rights. The balance between the public interest in the free press and the protection of a private individual injured by defamation can be maintained by a standard of negligence which takes into account the unique role of the press. Here, we apply the professional standard of care, which is that degree of care which ordinarily prudent persons in the same profession usually exercise under similar conditions. *See Triangle Publication, Inc. v. Chumley,* 253 Ga. 179, 181–82, 317 S.E.2d 534, 537 (1984); *Benson v. Griffin Television, Inc.,* 593 P.2d 511, 513 (Okla.App.1978); *see also Restatement (Second) of Torts* § 580B comments g & h (1977). The private plaintiff must establish by a preponderance of the evidence that this standard of care has been breached.

■ In applying this standard, custom in the trade is relevant but not controlling. *See Triangle Publication,* 253 Ga. at 181, 317 S.E.2d at 537. There are several factors outlined in the *Restatement (Second) of Torts* section 580B, comments g and h, which the finder of fact may consider:

1. Whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents;

2. The newsworthiness of the material and public interest in promoting its publication;

3. The extent of damage to the plaintiff's reputation should the publication prove to be false;

4. The reliability and trustworthiness of the source.

*See Triangle Publication,* 253 Ga. at 182, 317 S.E.2d at 537. The thoroughness of the accuracy check a reasonable person would make before publishing a defamatory statement will vary, depending on the relative weight of these factors and the circumstances of the case. *Id.,* 317 S.E.2d at 537. *See also Kohn v. West Hawaii Today, Inc.,* 65 Hawaii 584, 589–90, 656 P.2d 79, 82–83 (1982) (role of expert in determination of media negligence); Annotation, *Libel and Slander: Necessity of Expert Testimony to Establish Negligence of Media Defendant in Defamation Action by Private Individual,* 37 A.L.R. 4th 987 (1985).

■ When this negligence standard is applied to the record in this case, we cannot say, as a matter of law, that there is no genuine issue of material fact. The broadcast itself, or a complete transcript of the broadcast, is not in the record. This makes it impossible to know which precise statements were made and how they were made. We are left guessing as to the tone, tenor, focus and impact of the story when viewed in its entirety. Ordinarily, issues of negligence are not susceptible of summary adjudication but should by resolved by trial in the ordinary manner. *Schermer v. Muller,* 380 N.W.2d 684, 687 (Iowa 1986). As to Jones' claim for actual damages, a summary judgment at this point is inappropriate.

### VIII. *Punitive Damages.*

Palmer asserts that in order to obtain punitive damages, Jones must demonstrate actual malice. In making this argument, Palmer challenges the constitutionality of Iowa Code sections 659.2 and 659.3 (1987).[4]

These sections provide a special framework for any defamation action brought against a media defendant. This statutory framework places a substantial portion of the burden of disproving fault on a media defendant. These sections also provide standards for allowing punitive damages which are completely different from those standards articulated by the United States Supreme Court. Finally, this framework injects economic incentive into editorial decisions concerning retraction or correction prior to the time a potential plaintiff has filed a complaint.

■ All state law in this area must exist within the parameters of the first amendment of the United States Constitution as established by the Supreme Court. Iowa Code sections 659.2 and 659.3 improperly place the burden of disproving fault on a media defendant. In a defamation action, a plaintiff must shoulder the burden of demonstrating fault. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 778, 106 S.Ct. 1558, 1565, 89 L.Ed.2d 783, 794 (1986). Further, these sections provide standards for the determination of punitive damages which conflict with those established by the Supreme Court. *See Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 763, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593, 605 (1985); *Gertz,*

---

**4.** 659.2 Libel—retraction—actual damages.

In any action for damages for the publication of a libel in a newspaper, free newspaper or shopping guide, or for defamatory statements made on a radio or television station, if the defendant can show that such libelous matter was published or broadcast through misinformation or mistake, the plaintiff shall recover no more than actual damages, unless a retraction be demanded and refused as hereinafter provided. Plaintiff shall serve upon the publisher at the principal place of publication or upon the owner of a radio or television station at the owner's principal place of business a notice specifying the statements claimed to be libelous, and requesting that the same be withdrawn.

659.3 Retraction—actual, special, and exemplary damages.

If a retraction or correction thereof be not published in a conspicuous place and type in said newspaper, free newspaper or shopping guide, as were the statements complained of, in a regular issue thereof published within two weeks after such service, or in case of a defamatory statement on a radio or television station if a retraction or correction thereof be not broadcast at a time considered as favorable as that of the defamatory statement within two weeks after such service, plaintiff may allege such notice, demand, and failure to retract in the complaint and may recover both actual, special and exemplary damages if the plaintiff's cause of action be maintained. If such retraction be so published or broadcast, the plaintiff may still recover such actual, special, and exemplary damages, unless the defendant shall show that the libelous publication or defamatory statement was made in good faith, without malice, and under a mistake as to the facts.

418 U.S. at 349–50, 94 S.Ct. at 3011–12, 41 L.Ed.2d at 810–11. To the extent that Iowa Code sections 659.2 and 659.3 conflict with the first amendment of the United States Constitution, they are unconstitutional.

 We must now determine whether Palmer is entitled to a summary judgment in regard to Jones' request for presumed or punitive damages. A showing of actual malice is necessary for a plaintiff in a defamation action to receive punitive or presumed damages when the defamatory statements involve a matter of public concern. *See Bagley v. Iowa Beef Processors*, 797 F.2d 632, 644 (8th Cir.1986). In order to determine the appropriate standard for Jones' action for punitive damages, we must determine whether the allegedly defamatory statements involve an issue of public concern.

We recognize that this determination is precisely the determination which we rejected in considering a plaintiff's claim for actual damages. The application of different standards for punitive and actual damages is based on the different levels of state interest in compensating a private plaintiff's actual damages caused by a defamatory statement and exacting presumed or punitive damages from a defendant commenting on issues of public concern. The State has a "strong and legitimate" interest in compensating a private plaintiff for actual damages caused by defamation. *See Gertz*, 418 U.S. at 348, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. However, the State's strong and legitimate interest "extends no further than compensation for actual injury." *Id.* 418 U.S. at 348, 94 S.Ct. at 3011, 41 L.Ed.2d at 810.[5] The possibility of excessive punitive damage awards inevitably compounds the problems of press self-censorship and allows juries to penalize heavily those expressing unorthodox or unpopular views.

The Supreme Court has not expressly identified factors necessary to create a matter of public concern. Simple newsworthiness, however, will not by itself generate such concern. *Bagley*, 797 F.2d at 645. Under the standards adopted by the Eighth Circuit, a public concern encompasses "those controversies raising issues that might reasonably be expected to have or impact beyond parties directly enmeshed in the particular controversy." *Id.*

In this case, the controversy concerned the personnel policies of the Des Moines Fire Department. Based on the civil rights dispute surrounding the Des Moines Fire Department, the firing of a minority employee may reasonably be expected to have impact beyond the parties involved in Jones' labor dispute. Because the controversy is a matter of public concern, Jones must demonstrate actual malice to receive an award of punitive damages. This record will not support a finding of actual malice on the part of the media defendants.

IX. *Disposition.*

We direct a partial summary judgment be entered against the plaintiff on the claim for punitive damages. We affirm the trial court's denial of summary judgment upon all other issues.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**5.** *Gertz* articulated an expansive definition of actual damages. *Gertz*, 418 U.S. at 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. Even though *Gertz* did not direct the states to adopt this definition, we are nonetheless persuaded to accept *Gertz* as the appropriate definition for actual damages in a defamation action. It is the trial court's duty to insure that this expansive definition is not abused as an opportunity to avoid the constitutional limitations on punitive damages.