**CAVEMAN ADVENTURES UN, LTD. d/b/a The Electronics Cave, Appellee,**

v.

**PRESS–CITIZEN CO., INC. d/b/a Iowa City Press–Citizen, Appellant.**

No. 99–0435.

Supreme Court of Iowa.

Sept. 6, 2001.

Rehearing Denied Oct. 3, 2001.

---

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2001).

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2001).

Michael A. Giudicessi and Kasey W. Kincaid of Faegre & Benson LLP, Des Moines, and Randall B. Willman of Leff, Haupert, Traw & Willman, L.L.P., Iowa City, for appellant.

Martin A. Diaz, Iowa City, for appellee.

CARTER, Justice.

Press–Citizen Co., Inc., (the Press–Citizen) appeals from a judgment awarding substantial punitive damages against it in a libel action. The plaintiff-appellee is Caveman Adventures UN, Ltd. d/b/a the Electronics Cave (the Electronics Cave), a retail vendor of electronic equipment in Iowa City, including VCRs and camcorders. The gravamen of the Electronics Cave's claim in the district court was that a business competitor, Woodburn Electronics, Inc. (Woodburn), had libeled it by publishing a paid advertisement in the Press–Citizen accusing the Electronics Cave of false and misleading advertising designed to deceive the buying public. It contended that the Press–Citizen joined in the publication of the libel.

In seeking to reverse the judgment against it for punitive damages, the Press–Citizen urges that (1) the evidence was insufficient to support the jury's finding that it acted with actual malice in publishing the statement; (2) insufficient evidence was presented to show that the Electronics Cave suffered any injury to its reputation so as to be entitled to recovery under the standard established in *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217 (Iowa 1998); and (3) the punitive damages awarded were excessive. We agree with the contention that the evidence does not support the jury's finding that the Press–Citizen acted with actual malice. That conclusion warrants reversal of the district court's judgment without regard to the other claims on appeal.

The point of beginning in this dispute was an advertisement by the Electronics Cave in the Press–Citizen featuring VCRs and camcorders. The camcorders advertised by the Electronics Cave were of the 8mm variety. The advertisement sought to portray a competing variety of camcorders, using a VHS technology, as less desirable. The advertisement asserted that those camcorders produced poor video quality, did not copy well, had poor quality linear audio sound, cost more per minute of recording, were too heavy and thus required shoulder mounting, required an expensive adapter if used in a home VCR, and were not designed to be child proof. The advertisement touted the features of the 8mm camcorders, stating a single tape records for a longer period of time than a VHS tape, produces better video and audio quality, and is cheaper. In an effort to achieve balance, the advertisement re-

vealed that 8mm tapes cannot be played on a home VCR.

Woodburn features VHS camcorders. It elected to respond to the Electronics Cave advertisement with its own paid advertisement in the Press–Citizen. Because this advertisement refers to the Electronics Cave by name and insinuated that its advertising was misleading, the account executive who took the order sought approval from his superiors to run the copy that had been submitted. The proposed advertisement was reviewed first by the retail advertising manager, then by the advertising manager, and finally by the publisher of the paper. It was approved for publication by the publisher.

The Woodburn advertisement began by listing the negative statements about VHS camcorders that had been contained in the Electronics Cave advertisement and identified the Electronics Cave by name as the purveyor of the negative information. The advertisement then stated:

We at WOODBURN ELECTRONICS, INC., have, since 1946, been the leading authority in consumer electronics in the Iowa City area and want you to know the TRUTH, not fiction being cloaked as "fact".

**THE TRUTH IS:**

1. Even full size **VHS** Camcorders only weigh between two and three times that of an 8mm (about 4 pounds) and does not have to be carried on the shoulders (but it does conjure up a vivid image to say so, doesn't it?).

2. The **LOWEST RESOLUTION** of any Panasonic VHS or VHS–C CAMCORDER is **330 LINES** and the **HIGHEST RESOLUTION OF** an 8MM CAMCORDER is **270 LINES**. The **LOWEST RESOLUTION** of any Panasonic S–VHS (Super VHS) is **425 Lines** and **THE HIGHEST RESOLUTION** of a Hi–8mm CAMCORDER is **410 LINES.**

In addition, VHS & VHS–C Camcorders typically have shutter speeds of more than twice that of 8mm Camcorders (10,000 frames per second for VHS & VHS–C versus 4,000 frames per second for 8 mm & Hi-8) giving VHS & VHS–C excellent slow motion and still-frame resolution and unparalleled video quality.

3. The copies produced from VHS & VHS–C are superior to those of 8mm because of the higher resolution afforded by both VHS & VHS–C. The need for copies is all but eliminated in VHS & VHS–C because, since it IS VHS, it plays back in ANY VHS VCR (see # 4 Below).

4. One Play–Pak Adapter is included with **EVERY** VHS–C Camcorder and others can be purchased for about the price of three 8mm tapes.

5. All VHS & VHS–C Camcorders have excellent quality sound. Certain models have the same Hi-Fi Stereo sound found on the same VHS tapes used for Dolby Pro–Logic in-Home Theater Systems. These models' sound have a dynamic range exceeding 80 dB (a Compact Disc has a Dynamic range of 92 dB).

6. 8mm tape was originally designed as computer backup tape and later used for video.

7. A small child can "easily destroy" any VCR tape regardless of what type it is (just ask any parent!).

8. Much has been made of the fact that 8mm gives three hours of tape time to only 1.5 hours in VHS–C. The tapes themselves are comparatively priced. And when you get right down to it, when was the last time you and the family

sat down to a nice three hour long home video?

9. VHS & VHS–C Camcorders connect just as easily to a TV for playback or a VCR for making copies. The big difference is, with a VHS or VHS–C, you don't HAVE TO connect it to your TV for playback or make copies. The VHS & VHS–C Tapes playback in your VHS VCR saves your camcorder for what you bought it for—making videos. This saves wear on your Camcorder, protecting it from death due to overuse.

## MORE TRUTHS THEY "FORGOT" TO MENTION:

1. VHS is the accepted format for VCRs, not only in the U.S., but also in many parts of the world.

2. VHS, S–VHS and VHS–C Camcorders now comprise over 54% of all Camcorders in use and this format is the fastest growing category of all home video cameras for overall sales.

3. In addition to the standard features found on the 8mm Camcorders featured in the "Informative" ad, VHS S–VHS & VHS–C Camcorders are available with features like color, viewfinders, digital 20X power zoom, strobe, Genlock titling, freeze frame, time-lapse and many more.

4. The prices of the VHS–C Camcorders and 8mm Camcorders are model for model and feature for feature, close across the board with the edge going to VHS due to the greater number of features.

5. The battery life of 8mm Camcorders is 1 hour. If you are not near an outlet, you would have to buy additional batteries ($40–$60 each), charge them all and carry them with you to tape one tape. A VHS, VHS–C or S–VHS Camcorder's battery life equals or exceeds the tape recording time of the machine, i.e.[,][o]ne VHS tape uses one battery charge. (What a novel concept!)

6. No matter what, the 8mm and Hi–8 Format can never be changed to be compatible with accepted VHS format.

7. The Video Resolution of 8mm does not equal VHS or VHS–C and the Video Resolution of Hi–8 does not equal S–VHS.

8. The 8mm and Hi–8 tapes will never be able to play in VHS or S–VHS Machines.

9. The only true "Advantage" of 8mm or Hi–8 is that certain models made by certain manufacturers are a few ounces lighter in weight than comparable VHS–C Camcorders.

10. The more misinformed and confused a consumer is, the more units they sell.

*Come To The Store That Will Give You The Facts!!*

The Press–Citizen refused the Electronics Cave's request that it print a retraction of the contentions that its advertising was designed to deceive consumers.

In an earlier libel action against Woodburn Electronics, Inc., arising out of the same facts, the Electronics Cave obtained a judgment for $30,000 in actual damages. It claimed no additional actual damages in the present action against the Press–Citizen but did request punitive damages. Following a trial of this claim, the jury awarded the Electronics Cave $240,000 in punitive damages. Further facts which bear on the resolution of the appeal will be considered in our discussion of the legal issues presented.

## I. *The Constitutional Basis for the Actual–Malice Requirement.*

The Press–Citizen argues that the punitive-damage claim against it must fail unless the evidence shows that it acted with actual malice in publishing the challenged material. We recognized the validity of that argument in *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884 (Iowa 1989), wherein we stated that an interpretation of the First Amendment by the Supreme Court dictated that punitive damages may not be recovered in defamation actions against media publishers or broadcasters unless actual malice is established. *Jones,* 440 N.W.2d at 891.

As noted in our *Jones* case, the Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), federalized a large portion of libel law by adjusting the relationship between state libel law and the First Amendment guarantees of freedom of speech and of the press. In the wake of *Gertz,* the common-law rules of libel recovery have been most altered with regard to private-party actions against media publishers or broadcasters. As to those defendants, the Court held that, consistent with the First Amendment,

> the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

*Gertz,* 418 U.S. at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 810. In placing this limitation on the recovery of punitive damages from media defendants, the Court did not distinguish between media advertising and ordinary reportage. Because the plaintiff does not rely on that distinction to avoid a requirement to show actual malice, we do not consider it.

■ Knowledge of falsity or reckless disregard for the truth are the elements of actual malice laid down in *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). *New York Times Co.* made this determination in the context of deciding what type of publisher conduct would defeat the qualified privilege that the Court derived under the First Amendment for media coverage of public officials. *Gertz* mandated that this same standard of publisher conduct must be shown in order to recover punitive damages from a media defendant.

Our common-law definition of actual malice differs from the definition established in the *New York Times Co.* case. We have described actual malice in the defamation context as statements made with "ill-will, hatred or desire to do another harm." *Vojak v. Jensen,* 161 N.W.2d 100, 107 (Iowa 1968). We reaffirmed this common-law definition in *Vinson v. Linn–Mar Community School District,* 360 N.W.2d 108 (Iowa 1984), yet, in the same case, we applied the *New York Times Co.* definition of knowledge of falsity or reckless disregard for the truth in determining what conduct must be shown under *Gertz* in order to recover punitive damages. *Vinson,* 360 N.W.2d at 117. The trial court instructed the jury that it must find actual malice in accordance with the *New York Times Co.* standard. It also instructed the jury in accordance with Iowa Code section 668A.1 that proof of actual malice must be made by a preponderance of clear, convincing, and satisfactory evidence. Neither party claims that those instructions were improper.

■ In seeking to uphold the jury's verdict, the Electronics Cave urges that actual malice on the part of the Press–Citizen

can be found from the following circumstances:

(1) The Press–Citizen's retail advertising manager testified that she believed the advertisement accused the Electronics Cave of trying to defraud the consuming public,

(2) The advertisement was accepted contrary to the Press–Citizen's established policy of not printing attack advertisements, and

(3) By running the advertisement the Press–Citizen hoped to motivate the Electronics Cave to run a responsive advertisement.

We believe the issue of whether the Press–Citizen acted with actual malice must be judged within the context in which the challenged statements were published. This court has recognized that

[t]he law does not hold a seller to a strict accountability for those vague commendations of his wares which manifestly are open to difference of opinion, and which do not imply untrue assertions concerning matters of direct observations, nor has the buyer any right to rely on such statements.

*Hogan v. McCombs Bros.*, 190 Iowa 650, 656, 180 N.W. 770, 773 (1921); *accord Barr v. Butler*, 197 Iowa 575, 577, 195 N.W. 980, 981 (1923) (a seller may puff and commend the qualities of his property and may declare his own opinion of its value). We are satisfied that a comparable, albeit somewhat less permissive, rule exists with respect to attempts to deflate the puffery resorted to by a competitor. When attempts are made to counter such puffery through the use of comparative-product advertising, we are not persuaded that a newspaper in which this type of advertisement is run is guilty of reckless conduct if it does not ascertain which of the competing claims is closest to the truth. In the present case, unless the Press–Citizen made that determination it would not know

whether Woodburn's accusations of false advertising against the Electronics Cave were themselves false.

The test for determining the existence of actual malice under the *New York Times Co.* standard is purely subjective. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). The Court in *St. Amant* noted:

[The] cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*Id.* at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. In *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 135 (1964), the Court held that the actual malice standard required a "high degree of awareness of ... probable falsity." Judged by these standards none of the evidence relied on by the Electronics Cave to show actual malice was sufficient to establish that the Press–Citizen acted with knowledge that the claims made in Woodburn's advertisement were false or that the Press–Citizen acted with a reckless disregard for the truth. Consequently, the claim for punitive damages must fail.

We have considered all issues presented and conclude that the judgment of the district court should be reversed. The case is remanded to the district court for a judgment for defendant.

**REVERSED.**

SNELL, S.J.,* participates in lieu of STREIT, J., who takes no part.

* Senior Judge assigned by order pursuant to    Iowa Code section 602.9206 (2001).