# IN THE SUPREME COURT OF IOWA

No. 20–0023

Submitted April 14, 2021—Filed June 4, 2021

**MARK H. ANDREW,**

Appellee,

vs.

**HAMILTON COUNTY PUBLIC HOSPITAL** d/b/a **VAN DIEST MEDICAL CENTER,**

Appellant.

Appeal from the Iowa District Court for Hamilton County, James A. McGlynn, Judge.

Defendant hospital seeks interlocutory appeal from denial of its motion for summary judgment on defamation and wage pay claims. **REVERSED AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

David Bower (argued) and Frances M. Haas of Nyemaster Goode, P.C., Des Moines, for appellant.

Mark W. Thomas (argued) and Laura N. Martino of Grefe & Sidney, P.L.C., Des Moines, for appellee.

**OXLEY, Justice.**

Hamilton County Public Hospital brings this application for interlocutory appeal from the district court's denial of its motion for partial summary judgment concerning Dr. Mark Andrew's defamation claim and his Iowa Wage Payment Collection Law claim. We granted the hospital's application to address the defamation claim in the context of reports the hospital made to the Iowa Board of Medicine and the National Practitioner Data Bank. As explained below, Dr. Andrew's defamation claim fails because the challenged portions of the reports are nonactionable opinions. His statutory wage claim fails because he did not perform work for which he was not paid. We reverse the district court and remand for entry of judgment for the hospital on both claims.

## I. Background Facts and Proceedings.

Prior to the events leading to this litigation, Dr. Mark Andrew, a general surgeon, was employed by Hamilton County Public Hospital, operating as Van Diest Medical Center (VDMC). Dr. Andrew was hired in 2008 and had a contract with the hospital with three-year renewable terms. Despite the three-year-term provision, the contract could be terminated without cause upon ninety days' notice and in some circumstances of cause, immediately. By 2016, then-CEO Lori Rathbun had been frustrated for some time with what she considered to be Dr. Andrew's overcompensation and underperformance. The hospital leased Dr. Andrew's services to another hospital, where he spent about fifty percent of his time. In the year before the concerns leading to this litigation were raised, Ms. Rathbun had also reduced Dr. Andrew's compensation twice because of low productivity, once in December 2015, and again in October 2016.

In November 2016, a pharmacy contacted VDMC's quality officer to express concerns about Vicodin (hydrocodone) prescriptions one of Dr. Andrew's patients, T.C., was having filled. The pharmacy had attempted to contact Dr. Andrew multiple times, and he failed to return its messages. When a pharmacist was finally able to speak to him, the pharmacist was dissatisfied with his responses and contacted the hospital. The pharmacy was concerned by the large quantities prescribed and the frequency of refills. The patient's Prescription Monitoring Program (PMP)[1] report revealed dosage changes, switches between insurance payments and cash payments, different home addresses being used on prescriptions, and the patient's use of four different pharmacies to fill the prescriptions. Each of these factors raised red flags for the pharmacy and, upon its own investigation, for the hospital. The hospital discovered that other pharmacies had similar concerns about T.C.'s attempts to fill prescriptions and that one of the pharmacies listed T.C. on the Iowa Board of Pharmacy website. The hospital initially suspected T.C. had forged prescriptions, but a review of T.C's medical file revealed Dr. Andrew had prescribed the large quantity of pills.

Dr. Andrew treated T.C. over a four-year period, ultimately performing a bilateral orchiectomy (surgical removal of the testicles) in separate surgeries. The first was in September 2012, and the second was in October 2016, after T.C. rescheduled the surgery multiple times. Although chronic pain management is not generally part of a general surgeon's practice, Dr. Andrew prescribed approximately 11,940 Vicodin pills to T.C., who saw Dr. Andrew every two to four weeks for a total of

---

[1]PMP is a program run by the Iowa Board of Pharmacy and provides authorized providers and pharmacists with information regarding their patients' use of controlled substances.

ninety-seven documented visits over the four-year period. Despite T.C. having a separate primary care physician and receiving hip replacement and back surgery at other hospitals during this period, Dr. Andrew continued to prescribe pain medication to him.

As part of the hospital's internal investigation into the concerns raised by the pharmacy, Lisa Ridge, the hospital's chief nursing officer; Dr. Nicole Ehn, the hospital's medical director; and Dr. Scott Altman, an outside consultant previously hired by the hospital to help with personnel issues and creation of a peer review process, met with Dr. Andrew on December 8, 2016. At the meeting, Dr. Andrew admitted T.C.'s conduct related to filling his prescriptions was concerning, and he stated he discharged T.C. as a patient when he recently became aware of T.C.'s conduct the previous month. However, the notes from Dr. Andrew's November meeting with T.C. did not indicate he had discharged T.C. at that time. Dr. Andrew also admitted he did not use any type of pain management plan with T.C., nor did he refer T.C. to the on-site pain management specialist. When asked whether, in hindsight, he would have done anything differently, Dr. Andrew admitted he would have been more skeptical about T.C.'s rescheduling of surgery and would probably have used a PMP.

Following the December 8 meeting, Dr. Ehn wrote a report noting she had remaining concerns about Dr. Andrew's treatment of T.C., including the amount of narcotics prescribed, the length of time the prescriptions covered, and Dr. Andrew's failure to monitor the prescriptions. She further expressed concern over Dr. Andrew's decision to remove T.C.'s second testicle without seeking a second opinion. Finally, she noted the presence of "duplicate or multiple prescriptions" gave rise to

the possibility that T.C. was "fraudulently manipulating prescriptions" or that "the physician was providing multiple, large quantity prescriptions."

Through the investigation related to T.C., the hospital discovered opioid prescriptions Dr. Andrew provided to another patient, L.H., over a two-year period that also raised concerns. Dr. Andrew performed multiple removals of a recurring cyst on L.H.'s leg between January 2014 and June 2015. Dr. Andrew continued prescribing pain medication through June 2016. However, L.H. did not engage in the same questionable conduct as T.C., who remained the hospital's primary concern.

On December 15, after the hospital's investigation was completed, Ms. Rathbun terminated Dr. Andrew's employment through the for-cause provision in his contract. Specifically, Ms. Rathbun identified concerns raised about the care Dr. Andrew provided to his patients as the reason for his termination. Ms. Rathbun maintained Dr. Andrew's termination was an administrative decision, and the parties agree Dr. Andrew never underwent a peer review process. Dr. Altman encouraged Ms. Rathbun to subject Dr. Andrew's treatment of T.C. to peer review, but Ms. Rathbun preferred to terminate Dr. Andrew's employment as an administrative termination.

As a result of what he learned from the investigation, Dr. Altman filed a report with the Iowa Board of Medicine (IBM). The report included a recitation of facts surrounding the investigation of T.C.'s prescriptions, the accuracy of which Dr. Andrew does not dispute. The report also included responses to a number of predefined questions, and it is Dr. Altman's answers that form the basis of Dr. Andrew's defamation claim.

One question asked, "What would you like the Iowa Board of Medicine to do about your complaint?" Dr. Altman stated, in relevant part, under the header "The Physician":

> Volume of narcotic prescribing appears to be well beyond acceptable under any circumstances. It raises questions of marked naiveté, gross incompetence, and/or collusion with the patient for self-use, dealing, and/or distribution. Under any of those circumstances, should this physician's prescribing authority be reconsidered?
>
> Could this be an impaired physician who needs intervention and help?
>
> Non-emergent bilateral orchiectomy is generally not an endeavor to be taken without significant counsel and forethought. This case appears to vary significantly from standard of care and raises questions of clinical competency. Once again, is this a one-off, or fit a pattern. His surgical competency should be reviewed. Should this physician's surgical privileges be limited by the State?

Under the header "Other Potential Patients," Dr. Altman noted,

> Is it possible for the Board of Medicine to query the Iowa (and potentially other State's) PMP by provider to see if this situation is a one-off – or a pattern of narcotic overprescribing? If other potentially at risk patients are identified[,] the hospital would like to know so medical and pain management services can be provided to those patients.

Dr. Altman filed a second report with the IBM related to L.H., reiterating his concerns that a pattern may exist and requesting the board assess Dr. Andrew. On April 20, 2018, the IBM released a confidential letter finding the complaints filed by Dr. Altman did not warrant disciplinary action.

Following Dr. Andrew's termination, Lisa Ridge filed a report with the National Practitioner Data Bank (NPDB), a national repository for certain information required to be reported about health care practitioners. The hospital believed it was required to report Dr. Andrew's for-cause termination. The contents of that report include only a factual

recitation of Dr. Andrew's treatment of T.C., and Dr. Andrew does not dispute its accuracy. The NPDB report does not include any of the questions raised by Dr. Altman in his report to the IBM.

Dr. Andrew sued the hospital for wrongful termination, breach of fiduciary duty, and age discrimination, alongside defamation and libel. The hospital removed the case to federal court, where the court granted summary judgment in favor of the hospital on the age discrimination claim and remanded the remaining state law claims. Dr. Andrew amended his complaint once it was back in state court to add a claim under the Iowa Wage Payment Collection Law (IWPCL).[2]

The hospital moved for partial summary judgment, seeking dismissal of the defamation and IWPCL claims. The district court concluded fact issues concerning whether the hospital acted with good faith or with malice in making the IBM and NPDB reports precluded summary judgment on the defamation claim. The district court also denied summary judgment on the IWPCL claim, characterizing the ninety days' compensation Dr. Andrew would be entitled to receive under his contract as severance pay under Iowa Code section 91A.2(7)(*b*) and finding the parties' dispute over whether Dr. Andrew was terminated for cause or without cause created a jury question. The hospital applied for interlocutory review, which we granted.

## II. Standard of Review.

"Our review of rulings on motions for summary judgment is for correction of errors at law." *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa

---

[2]Dr. Andrew also asserted a defamation claim against Ms. Rathbun individually, specifically that she "falsely spoke of and concerning Plaintiff, stating to the Iowa Board of Medicine and the National Practitioner Data Bank that Andrew had provided substandard or inadequate care in prescribing dispensing or administering medication." Ms. Rathbun passed away in February 2018, and Dr. Andrew voluntarily dismissed his claim against her in November 2019.

2013). We view the record "in the light most favorable to the nonmoving party." *Id.* Summary judgment is appropriate "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* "[S]ummary judgment 'is afforded a unique role in defamation cases. Judges have a responsibility to determine whether allowing a case to go to a jury would . . . endanger first amendment freedoms.'" *Id.* (omission in original) (quoting *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 889 (Iowa 1989), *overruled in part on other grounds by Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 224 (Iowa 1998)).

**III. Analysis.**

The underlying breach of contract claim is still pending; this appeal focuses on two distinct issues. The first is whether statements included in the IBM and NPDB reports were defamatory and, if so, whether the hospital is entitled to statutory immunity. Second, we must consider whether Dr. Andrew's claim under the IWPCL fails as a matter of law based on his contract with the hospital.

**A. Are the Statements in the IBM Report or the NPDB Report Defamatory?** Defamation law sits at the intersection of torts and First Amendment rights. "The law of defamation is composed of the twin torts of libel and slander." *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004). "To establish a prima facie case in any defamat[ion] action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Bierman*, 826 N.W.2d at 464 (alteration in original) (quoting *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996)). The hospital contends the statements were not defamatory, so the statements are not actionable. Even if they are actionable, the hospital asserts it is entitled to statutory immunity afforded to authors of both reports. "Whether a statement is capable of a

defamatory meaning is a question for the court." *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021).

One limit on a defamation claim is that "[o]pinion is absolutely protected under the First Amendment." *Kiesau v. Bantz*, 686 N.W.2d 164, 177 (Iowa 2004) (quoting *Jones*, 440 N.W.2d at 891), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). Thus, if the statements Andrew complains about are opinions rather than statements of fact that can be proved false, they are not actionable. Whether a statement is one of fact or opinion is a "difficult question involve[ing] important first amendment issues, [and] its determination is one for the court." *Jones*, 440 N.W.2d at 891.

In addition, some statements are protected, or privileged, despite being libelous. Qualified privilege is an affirmative defense against a defamation claim that requires the court to first "determine whether the occasion of [the] statement was qualifiedly privileged" and, if it was, to then "determine[] whether that privilege was abused." *Barreca*, 683 N.W.2d at 118.

Here, that privilege takes the form of statutory immunity. Based on Iowa Code chapter 272C, the Iowa Administrative Code directs that a medical licensee must file a report with the IBM if the "licensee has knowledge as defined in this rule that another person licensed by the board may have engaged in reportable conduct." Iowa Admin. Code r. 653—22.2(2). Reportable conduct includes

> wrongful acts or omissions that are grounds for license revocation or suspension under these rules or that otherwise constitute negligence, careless acts or omissions that demonstrate a licensee's inability to practice medicine competently, safely, or within the bounds of medical ethics, pursuant to Iowa Code sections 272C.3(2) and 272C.4(6) and 653—Chapter 23.

*Id.* r. 653—22.2(1).

The Iowa Code provides immunity for filing such reports:

> A person shall not be civilly liable as a result of filing a report or complaint with a licensing board or peer review committee, or for the disclosure to a licensing board or its agents or employees, whether or not pursuant to a subpoena of records, documents, testimony, or other forms of information which constitute privileged matter concerning a recipient of health care services or some other person, in connection with proceedings of a peer review committee, or in connection with duties of a health care board.

Iowa Code § 272C.8(1)(*b*) (2016). This immunity is not absolute: "[S]uch immunity from civil liability shall not apply if such act is done with malice." *Id.* Additionally, employers may not retaliate against a person because they filed a complaint with a licensing board. *Id.* § 272C.8(1)(*c*).

The NPDB report is part of the Health Care Quality Improvement Act of 1986 (HCQIA), which Congress enacted to improve the quality of medical care and "facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 211–12 (4th Cir. 2002) (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1322 (11th Cir. 1994)); *see also Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir. 1996) ("Recognizing '[t]he threat of private money damage liability . . . unreasonably discourages physicians from participating in effective professional peer review,' Congress deemed it essential for the legislation to provide qualified immunity from damages actions for hospitals, doctors and others who participate in professional peer review proceedings." (alteration and omission in original) (citation omitted) (quoting 42 U.S.C. § 11101(4))). The HCQIA provides immunity for filing an NPDB report as follows: "No person or entity . . . shall be held liable in any civil action with respect to any

report made under this subchapter . . . without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c) (2012).

The district court denied summary judgment on the defamation claim by focusing on the immunity provisions and finding "that the issues of good faith and malice are questions for the jury." With respect to the NPDB report, it further concluded the fact that the hospital did not provide a peer review process for Dr. Andrew precluded its reliance on HCQIA immunity. It reasoned that absent a peer review process, there should never have been a report that would be subject to the immunity. The district court did not directly address whether the statements were defamatory or address the hospital's argument that the challenged statements were merely opinions rather than actionable statements of fact. We start, and ultimately end, our analysis with the threshold issue of whether the statements were protected opinions.

1. *Preservation of the hospital's argument that the IBM report expressed opinions.* The hospital argues that Dr. Altman's report to the IBM expressed his opinion, not actionable defamation. Dr. Andrew argues the hospital did not preserve this issue for our review. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002). This is because "[i]t is not a sensible exercise of appellate review to analyze facts of an issue 'without the benefit of a full record or lower court determination[].'" *Id.* (second alteration in original) (quoting *Yee v. City of Escondido,* 503 U.S. 519, 538, 112 S. Ct. 1522, 1534 (1992)).

The hospital consistently argued to the district court that the statements were opinions and therefore not actionable. Even though the district court did not discuss in its ruling whether the statements were

opinions, our review of the record, *see Lamasters v. State*, 821 N.W.2d 856, 863 (Iowa 2012) ("Additionally, the record fails to reveal that the jurisdictional issue was considered by the district court through other means." (quoting *Meier*, 641 N.W.2d at 540)), reveals it considered, and necessarily rejected, the argument.

During the hearing on the motion for partial summary judgment, the hospital explicitly argued the statements were not actionable because they were opinions. In response, the district court had the following exchange with the hospital's counsel:

> THE COURT: But isn't the question of malice something that goes to the opinion, whether that opinion was given for malicious reason?
>
> MR. BOWER: Sure.

The hospital's counsel went on to argue "that there is simply no evidence in this record that any of those three individuals did not sincerely hold their opinions, did not sincerely base those opinions on evidence that was before them that is largely undisputed." In response, the court asked,

> [B]ut if plaintiff is claiming those statements are defamatory, and I don't know what the plaintiff's proof is, but doesn't plaintiff have the right to try to submit counter-opinions saying -- to show whether those three opinions you refer to, whether those are or are not correct? Doesn't that become a fact issue? The correctness of those three opinions? He's claiming that they're not.

This exchange reveals the issue was raised and decided by the district court, and we proceed to consider whether the statements were opinions or statements of fact.

2. *The statements in the IBM report were nonactionable opinions.* In *Gertz v. Robert Welch, Inc.*, the Supreme Court observed, "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of

judges and juries but on the competition of other ideas." 418 U.S. 323, 339–40, 94 S. Ct. 2997, 3007 (1974). Based on *Gertz*, the D.C. Circuit created a four-factor test to "determine whether the alleged defamatory statement was fact or opinion." *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 769 (Iowa 2006) (discussing *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc)). We adopted this four-factor test in *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, relying on the United States Court of Appeals for the Eighth Circuit case *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) (en banc). *Id.* at 770.

The Supreme Court subsequently clarified its opinion doctrine in *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 110 S. Ct. 2695 (1990). Under *Milkovich*, "only statements regarding matters of public concern that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Yates*, 721 N.W.2d at 771.

> [T]he framework of analysis is no longer whether the alleged defamatory statement is fact or opinion. Rather the framework of analysis now is whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts are capable of being proven true or false.

*Id.* Therefore, "statements of opinion can be actionable if they imply a provabl[y] false fact, or rely upon stated facts that are provably false." *Id.* (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994)). Because *Milkovich*'s framework remained quite similar to the four-factor test we had already adopted, we continue to use that test in defamation cases involving opinions. *See id.*

a. *Factors one and two.* "The first relevant factor is whether the alleged defamatory statement 'has a precise core of meaning for which a

consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous.' " *Id.* at 770 (quoting *Ollman*, 750 F.2d at 979). "We [have] characterized this factor as 'the precision and specificity of the disputed statement.' " *Id.* (quoting *Jones*, 440 N.W.2d at 891). In other words, was Dr. Altman's report precise and specific? The second factor is related to the first, focusing on "the degree to which the [alleged defamatory] statements are . . . objectively capable of proof or disproof[]." *Id.* (alterations and omission in original) (quoting *Ollman*, 750 F.2d at 981). The statement is likely one of fact if it is "precise and easy to verify." *Id.* (quoting *Jones*, 440 N.W.2d at 891).

Dr. Andrew objects to two portions of Dr. Altman's report. First, he objects to Dr. Altman's characterization of Dr. Andrew's prescription practices as excessive and his level of care as incompetent. Given the competing experts on the issues of excessiveness and competence in the underlying contract dispute, this issue does not qualify as one for which a consensus of understanding exists. In other words, whether the amount of pills prescribed was excessive or violated the standard of care is not precise or verifiable. *See id.* ("In this connection, one writer has defined a factual statement as one that relates to an event or state of affairs that existed in the past or exists at present and is capable of being known."). Rather, Dr. Altman's statements are more properly considered characterizations of specific facts, which themselves are not false. *See id.* at 772–73 ("Viewing this statement in context, we first note that Ditmars' statement was in response to Crawford's questioning of the reasons given for terminating the kennel's booking contract. Ditmars set out facts (the kennel's ranking compared to other kennels), which signaled to a reasonable listener that his statement 'poor and substandard performers'

represented a characterization of those facts."). The first and second factors indicate this part of Dr. Altman's report is an opinion.

Dr. Andrew next objects to the suggestion that the amount of narcotics he prescribed may give rise to an inference of self-use, collusion, or drug dealing. This statement falls closer to the line, as accusations of criminal conduct are defamatory per se. *See Barreca*, 683 N.W.2d at 116; *see also Bauer*, 958 N.W.2d at 199 ("An example of a defamatory statement that is capable of precise meaning and easily verifiable is an accusation that a person committed a crime."). To the extent Dr. Altman was questioning whether Dr. Andrew was dealing opioids, or colluding with his patient to do so, that is something that could be proven as a factual matter and it is not an indefinite or ambiguous statement. That the statements "are in the form of questions does not change the analysis. Questions, like opinions, can be defamatory when they imply the existence of defamatory facts." *Nunes v. Lizza*, 486 F. Supp. 3d 1267, 1284 (N.D. Iowa 2020). While the first and second factors indicate that these statements could be actionable defamation, "a term is not automatically categorized as an assertion of fact because it is capable of precise meaning and verification when read in isolation." *Bauer*, 958 N.W.2d at 199. Rather, we must consider the context of the statements under the third and fourth factors.

b. *Factors three and four.* "The third relevant factor is the context in which the alleged defamatory statement occurs," *Yates*, 721 N.W.2d at 770, which we have described as the "literary context," *Jones*, 440 N.W.2d at 891. "The degree to which a statement is laden with factual content or can be read to imply facts depends upon . . . the whole discussion." *Yates*, 721 N.W.2d at 770 (citation omitted). We consider the statement as "part of a whole, including the tone of the broadcast and the use of cautionary language." *Jones*, 440 N.W.2d at 892 (citing *Janklow*, 788 F.2d at 1302).

"The last relevant factor is 'the broader social context into which the [alleged defamatory] statement fits.'" *Yates*, 721 N.W.2d at 770 (alteration in original) (quoting *Ollman*, 750 F.2d at 983). This factor considers "the types of writing or speech in which the statement appears." *Id.* We have "characterized this factor as 'the social context,' and noted that this factor 'focuses on the category of publication, its style of writing and intended audience.'" *Id.* (quoting *Jones*, 440 N.W.2d at 891–92).

In short, the third factor is "narrowly linguistic," and the fourth factor is "broadly social." *Id.* (quoting *Ollman*, 750 F.2d at 982). Here, both the narrow and the broad context indicate all of Dr. Altman's statements are nonactionable opinions.

First, the narrow literary context of Dr. Altman's statements indicates he was expressing concerns he thought might require further investigation, not accusing Dr. Andrew of engaging in improper conduct. He reported facts, which Dr. Andrew admits were true, and then raised potential concerns using cautionary language that directly related to those facts. Specifically, he used qualified language, saying that the volume of pills "appears" to be beyond acceptable levels and stating the undisputed facts "raise[] questions" ranging from naiveté to collusion for drug-dealing. With respect to Dr. Andrew's surgical decisions, Dr. Altman used similar cautionary language revealing an expression of opinion, not a statement of fact, stating: "This case *appears* to vary significantly from standard of care and *raises questions* of clinical competency." (Emphasis added.) Read in context, Dr. Altman raised a concern he thought the IBM should investigate further; he did not state he believed Dr. Andrew dealt drugs or engaged in malpractice. Put another way, what he wrote in the IBM report was his opinion that specific undisputed facts raised concerns the board should investigate. To this extent, his characterization is like the

statement in *Yates* where the defendant disclosed "the facts underlying his statement of 'substandard and poor performers,' facts that [the plaintiff] conceded were true," such that "[a] reasonable reader could conclude that [the defendant] was giving his personal conclusion or opinion about those undisputed facts." 721 N.W.2d at 773; *see also Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729–31, 731 n.13 (1st Cir. 1992) (holding that newspaper articles accusing touring company of deliberately deceiving the public by attempting to pass off its musical comedy as a Broadway show of same name was not actionable defamation where factually accurate information, coupled with context and tenor of article, led "inevitably to the conclusion that no reasonable reader could interpret [the journalist's] statements as factual assertions of dishonesty" as opposed to his own view of the company's actions).

Turning to the broader social context, Dr. Altman raised concerns in a report to a medical licensing board. Such reports are confidential, mandatory in some cases, and serve the important purpose of notifying the board that a physician may be placing the public at risk. The statutory scheme requires physicians to make a report if they have information that a physician licensed by the IBM "may have engaged in reportable conduct." Iowa Admin. Code r. 653.22—2(2). It also allows physicians to raise concerns without fear that they will be personally liable if those concerns turn out to be unfounded after investigation, *see* Iowa Code § 272C.8(1)(*b*), and prohibits employers from retaliating against a person who files a report with the board, *see id.* § 272C.8(1)(*c*).

Protecting explanatory statements made in the context of a report to the IBM provides a strong policy justification for recognizing Dr. Altman's concerns as nondefamatory opinion rather than actionable assertions of fact. *See Vranos v. Franklin Med. Ctr.*, 862 N.E.2d 11, 18 (Mass. 2007)

("[The confidentiality of Massachusetts' peer review process] express[es] the Legislature's considered judgment that the quality of health care is best promoted by favoring candor in the medical peer review process."). Dr. Andrew does not dispute the factual portions of Dr. Altman's report, arguing only that Dr. Altman should have stopped with the recitation of facts and not provided his view of the concerns raised by those facts. But this argument ignores the context in which the statements were made. *See Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 48–49 (Iowa 2018) ("[G]iven the dialogue between the Church and the plaintiffs as to whether the women were 'victims' or 'sinners,' the context of [a church elder's] statement [("Unless . . . he was holding a knife to her throat, it wasn't rape.")] supports a finding that he was expressing his subjective belief about the plaintiffs' status as victims, rather than communicating a verifiable fact." (omission in original)).

The narrow literary and the broad social contexts establish that Dr. Altman's report contained only nonactionable opinions. The statutory scheme requires disclosure of information in the confidential setting of reports to the IBM, the purpose of which is to protect the public and the medical profession. Dr. Altman recited specific facts, undisputed by Dr. Andrew, to support his concerns, which he expressed using cautionary language. Protecting physicians' ability to identify the concerns raised by specific information they are required to report is a significant public good that supports precluding a defamation action here. Given the context in which Dr. Altman's concerns were raised, his views did not "impl[y] a provably false fact[] or rel[y] upon stated facts that are provably false." *Yates*, 721 N.W.2d at 772.

The district court denied summary judgment on the basis that issues of good faith and malice, required to establish the hospital's

statutory immunity, are jury questions. But the proper sequence of addressing a defamation claim begins with first determining whether a statement is capable of defamatory meaning, which includes considering whether the challenged statement is a nonactionable opinion. Only if a statement is potentially defamatory does statutory immunity come into play. The challenged statements in Dr. Altman's reports to the IBM reflect his opinions about the concerns raised by the undisputed facts and therefore are not actionable as defamation.

3. *The statements in the NPDB report were not defamatory.* Dr. Andrew also asserts that the hospital defamed him in the NPDB report filed by Lisa Ridge. Unlike the IBM report, the statements Ms. Ridge made in the NPDB report included only a factually-accurate recitation of the incident that led to the hospital's investigation of Dr. Andrew's prescribing activities. Proving defamation requires proving falsity, *see Bierman*, 826 N.W.2d at 463–64, and Dr. Andrew has identified no false statement in the NPDB report.

Dr. Andrew defends the denial of summary judgment based on the district court's conclusion that the hospital's failure to provide Dr. Andrew with a peer review process could raise a fact issue with respect to the hospital's ability to assert statutory immunity under the HCQIA. *See* 42 U.S.C. § 11137(c) ("No person or entity . . . shall be held liable in any civil action with respect to any report made under this subchapter . . . without knowledge of the falsity of the information contained in the report."). Because Dr. Andrew does not allege any part of the NPDB report is false, the report is not defamatory as a matter of law, and there is no need to reach the hospital's immunity defense. Dr. Andrew's defamation claim based on the NPDB report fails.

**B. Whether Dr. Andrew's IWPCL Claim Fails as a Matter of Law Based on His Contract with the Hospital.** Dr. Andrew amended his complaint after this case returned to state court to add a claim under the IWPCL. Iowa Code chapter 91A permits an employee to bring a cause of action to collect wages, which it defines as including

compensation owed by an employer for:

> *a.* Labor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation.

> *b.* Vacation, holiday, sick leave, and severance payments which are due an employee under an agreement with the employer or under a policy of the employer.

Iowa Code § 91A.2(7).

Dr. Andrew's contract with VDMC allowed the hospital to terminate his employment without cause on ninety days' notice. Under that provision, the hospital could relieve Dr. Andrew of his duties immediately, but Dr. Andrew remained eligible for employee benefit plans and would receive his compensation during the ninety-day period. Dr. Andrew argues that if the jury finds the hospital lacked cause to terminate his contract immediately—the basis of his breach of contract claim that remains pending—and finds the hospital would have used the without-cause provision instead, the ninety days' compensation he should have received would amount to wages or severance pay, and the hospital's failure to pay that compensation violated chapter 91A.

In *McClure v. International Livestock Improvement Services Corp.*, we rejected a nearly identical claim under the IWPCL. 369 N.W.2d 801, 802–03, 805 (Iowa 1985). An employee's contract included a without-cause provision requiring thirty days' notice prior to termination under the IWPCL. *Id.* at 802. The district court concluded the employer lacked

cause, so the employee was entitled to thirty days of compensation under the IWPCL. *Id.* at 803. We observed that "[t]he general tenor of the [IWPCL] is the regulation of the payment of wages which *have been earned.*" *Id.* (emphasis added). Claims under the IWPCL "involved accrued as distinguished from as yet unearned pay." *Id.* Where the amount McClure requested was "not for services 'rendered' but for damages," it did not fit into the IWPCL. *Id.* at 804. The same is true here. Dr. Andrew did not work during the ninety-day period he claims he was entitled to compensation. His claim is for contract damages, not for wages for services rendered.

In rejecting McClure's claim for severance pay, we explained:

> "Severance payments" . . . are considerably different from an item of damage predicated on breach of contract for failing to give a specified notice of termination. A severance payment is an amount which is granted at contract termination on account of past services, and is usually calculated on the basis of the length of those services.

*Id.* at 804–05. Additionally, we observed that

> a typical severance pay clause would have operated thus: the employer would give the thirty-day notice, the employee would work the thirty days, and at the end of that period the employee would receive his wages for the thirty days plus a lump sum calculated under the severance pay clause on the basis of years of service.

*Id.* at 805. Dr. Andrew urges us to ignore this discussion as dicta.

As in *McClure*, in this case "[w]e do not have a severance pay clause . . . [; w]e have a notice of termination clause." *Id.* If it applies, the provision would compensate Dr. Andrew for not working during the ninety-day notice period rather than pay him for services rendered or compensate him for prior years of service. As in *McClure*, "[t]he result is that [Dr. Andrew] does not have a Wage Law claim[; h]e has a common-law cause of action for damages" under his breach of contract claim, *id.* He is

free to argue VDMC would have terminated him under the provision allowing him to cease working but still receive compensation as part of that claim. The IWPCL claim fails as a matter of law.

## IV. Conclusion.

We reverse the judgment of the district court and remand with instructions to enter summary judgment in favor of the hospital on count III for defamation and count V for a wage law violation.

**REVERSED AND REMANDED.**